UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Cosme Cesar Escudero-Aviles

_____

(Enter above the full name of
plaintiff in this action)

v.

Milton Hershey School

_____

_____

(Enter above the full name of
the defendant(s) in this action)

CIVIL CASE NO: 11-CV-1858
(to be supplied by Clerk
of the District Court)

**FILED**
**HARRISBURG, PA**

OCT 07 2011

MARY E. D'ANDREA, CLERK
Per_____

COMPLAINT

1. The plaintiff Cosme Cesar Escudero-Aviles a citizen of

the County of Berks State of

Pennsylvania, residing at 1140 Scott Street, Reading, PA 19611

wishes to file a complaint under Jury Trial Demanded
(give Title No. etc.)

_____

2. The defendant is Milton Hershey School + Administration

_____

3. STATEMENT OF CLAIM: (State below the facts of your case. If you have paper
exhibits that give further information of your case, attach them to this completed form. Use as
much space as you need. Attach extra sheet(s) if necessary) _____

Complaint Attached

3. (CONTINUED) _____

_____

_____

_____

_____

_____

_____

_____

_____

4. WHEREFORE, plaintiff prays that _____

_____

_____

_____

_____

_____

_____

_____

(Signature of Plaintiff)

*[DECEMBER 2, 2009 DRAFT]*

## IN THE COURT OF COMMON PLEAS

## OF DAUPHIN COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COSME CESAR ESCUDERO-AVILES,<br>and,<br>SYLVIA AVILES-ESCUDERO<br>Plaintiffs, | : <br> : <br> : <br> : <br> : | NO. |
| v. | : <br> : | **JURY TRIAL DEMANDED** |
| MILTON HERSHEY SCHOOL,<br>Defendant | : <br> : | |

## COMPLAINT

AND NOW, come plaintiffs, Cosme Cesar Escudero-Aviles and Sylvia Aviles-Escudero, and file the following Complaint against defendant, the Milton Hershey School:

### I.     INTRODUCTION

1.     This lawsuit seeks injunctive and monetary relief against a Pennsylvania residential childcare charity for negligent and intentional acts that have injured the plaintiffs in this action.

### II.     PARTIES

2.     Plaintiff Cosme Cesar Escudero-Aviles ("Cesar") is an individual who recently turned 18 years of age and resides at 1140 Scott Street, Reading, PA, 19611.

3.     Plaintiff Sylvia Aviles-Escudero ("Mrs. Escudero") is Cesar's mother. Mrs. Escudero is above 18 years of age and also resides at 1140 Scott Street, Reading, PA, 19611.

4.     Defendant Milton Hershey School ("MHS" or the "School") is a not-for-profit corporation with a mailing address at Founders Hall, Founders Lane, Hershey, PA 17033.

### III.     FACTS

5.     MHS is a childcare facility located in Hershey, Pennsylvania with resources totaling approximately $7 billion.

1

6.      MHS represents itself as able to meet the emotional, educational, and nurturing needs of at-risk youth from backgrounds of poverty and social want, convincing guardians of such children to enroll them in the School.

7.      MHS actively solicits these children, enticing their guardians to enroll them with such incentives as offers of scholarships to college and promises of special services consistent with the needs of at-risk youth, provided in a homelike atmosphere.

8.      Poor families, dazzled by the opulent MHS facilities and persuaded by the School's representations, make the agonizing decisions to place their children in the School's care for a comprehensive program that includes residence in a student home, a kind of group home housing 10 to 13 children under the supervision of a houseparent couple.

9.      The School's website makes the following representations, among others:

    • At MHS, "your dreams for a child's future can come true."

    • MHS provides "a nurturing, family like student home;" and,

    • "MHS holds true to its original mission of helping children reach their full potential, intellectually, emotionally, socially, physically, and spiritually."

10.     The children who enroll in MHS are often from single-parent households, have lost one or both parents, and come from backgrounds of poverty such that their psyches are fragile.

11.     Many of these children can be described as having experienced the "trilogy of pain," i.e., loss, abandonment, and rejection such that more of this pain is especially devastating to them.

12.     Thus, care of children enrolled at MHS must reflect an understanding of the special vulnerability of these children to additional life trauma.

13.     MHS is aware that, once children have been enrolled in the School and their childhoods entrusted to MHS and its year-round program, MHS must do everything possible to maintain permanency, stability, and consistency for these children; i.e., that subsequent removal of these children should occur only under extreme circumstances.

14.    MHS represents itself as providing children with competent houseparents, teachers, child psychologists, and other frontline staff, led by competent professionals, and that MHS is thus able to meet the needs of the children whose enrollment it solicits; i.e., MHS makes clear that it will avoid gratuitously inflicting additional loss, abandonment, or rejection on these children.

15.    But in reality, MHS is poorly run, led by individuals with checkered backgrounds, fosters abuses of children, fails to provide basic programs required by at-risk youth, and applies its own rules and regulations so haphazardly that it harms children on a staggering scale.

16.    This is reflected in failure rates that should be unimaginable for an institution spending, on information and belief, approximately $100,000 per child annually.

17.    On information and belief, nearly 1 of every 2 children entering MHS is eventually either expelled or withdrawn after inadequate programs fail them. This is psychologically devastating to children who have already suffered substantial life trauma prior to entering MHS.

18.    On information and belief, over the last six years and prior to the start of the current school year, MHS enrolled 2,353 children; a staggering 1,141 children were removed before graduating; and only 786 children graduated or "aged out," many without diplomas. This constitutes an average of one child removed from MHS for every single school day of the past six years. Exhibit "A" to this Complaint is a chart compiled from MHS publications and summarizing MHS attrition figures.

19.    The massive turnover at MHS leads to severe emotional damage on the part of children whose special circumstances makes them particularly vulnerable to the trauma and dislocation of such jarring changes as removal from MHS prior to graduation.

20.    As explained below, MHS' staggering attrition is caused by senior leaders who promulgate poor policies and are fundamentally incompetent to address the needs of at-risk children. MHS leaders are improperly hired, obliterate childcare and educational norms, and cause vast damage to child victims cycled in and out of MHS.

21.    Cesar is one of the 1,141 children removed from MHS over the last six years. Plaintiffs seek injunctive relief and monetary damages against defendant MHS for negligence, fraudulent

3

misrepresentation, false imprisonment, breach of fiduciary duty, and intentional infliction of emotional harm, all arising from Cesar's expulsion immediately prior to his senior year.

22.     Cesar is a gifted student from a single-parent household in a poor neighborhood of Reading, Pennsylvania. At the time that the acts complained of here occurred, Cesar had overcome daunting life challenges to arrive within striking distance of successful enrollment in college and a promising life beyond.

23.     Cesar is of Hispanic descent and was recruited by MHS to enroll in the School due to his great potential and aptitude, including his status as a standout on a local chess club, athlete, and honor role student with an IQ of 142, all of which is reflected in numerous behavioral, academic, and athletic awards garnered by Cesar. Exhibit "B" to this Complaint is an article entitled *"Master in the Making Likes to Beat Adults,"* from a Reading publication, concerning Cesar's chess activities and noting that Cesar was ranked 50th in the state among all children his age. Exhibit "C" to this Complaint is one of Cesar's business club awards, reflecting Cesar's achievement in the area of business skills. Exhibits "D" and "E" to this Complaint are, respectively, Cesar's Police Athletic League reading award and a science fair award, also demonstrating Cesar's exceptional qualities prior to entering MHS. Exhibit "F" to this Complaint is a photograph of a dozen of the various athletic and chess awards garnered by Cesar over the years.

24.     Cesar has received numerous similar awards, including at MHS, exhibiting remarkable resiliency and promise in spite of severe societal, familial, and financial challenges.

25.     In short, Cesar is a poster child for the type of student recruited by MHS and has flourished throughout his life when given the opportunity.

26.     Cesar has been raised his entire life solely by his mother, Mrs. Escudero, an immigrant from Mexico who is disabled and burdened with such difficulties as speaking broken English, her second language.

4

27. Cesar has never had any meaningful relationship with his father. When Cesar's father did, briefly, give the appearance of entering Cesar's life, it proved illusory and the father quickly disappeared, in a manner that only added to the pain in Cesar's life.

28. MHS was aware that Cesar, as with other MHS children, lived in the shadow of potential loss, abandonment, or rejection and was thus psychologically particularly vulnerable to subsequent dislocation and rejection.

29. Mrs. Escudero, even as a single and financially strapped parent, has worked tirelessly to give Cesar every chance in life, fiercely protecting her son in spite of the obstacles that she faces.

30. It was thus with great trepidation, and relying on MHS' representations about its programs as trumpeted in advertisements in various media and elsewhere, that Mrs. Escudero agreed to entrust Cesar into the care of MHS, in 2006, convinced of the School's fitness for her child.

31. After an initial period of adjustment, Cesar eventually continued to flourish at the School, similar to what he had been doing at home. This was in spite of certain program inadequacies and misconduct by some MHS staff.

32. Cesar joined the MHS football team in 9th grade, making friends and distinguishing himself among his teammates, having played organized football since the age of five.

33. Cesar regularly made the honor role and distinguished honor role at MHS, earning numerous awards and other distinctions at the School.

34. Cesar was selected from among 400 MHS students as one of only 13 children to travel to Mexico in 2008, to help build housing for indigent Mexicans.

35. Cesar's contributions during this volunteer trip were exemplary, to a degree where the program's local counterpart specifically sought to have Cesar return for a full year, so impressive were Cesar's efforts.

36. Besides football, Cesar was also on the MHS ice hockey and baseball teams, contributing in a wholesome, constructive, and healthy manner to these programs, too.

37. For three successive years, Cesar garnered the French Award, for French I, French II, and then again for French III, topping all other MHS students in these classes.

38. Demonstrating remarkable computer prowess, Cesar gained the highest score in MHS history in receiving his certification in Computer Information Systems.

39. Cesar also earned participation certificates from Junior Achievement for leadership training while he was at MHS as well as for participation in a model legislative session sponsored by the National Hispanic Institute in Rochester, New York.

40. Among the comments made by Cesar's MHS teachers on Cesar's academic evaluations were the following:

 (a) "Exceptional test scores."

 (b) "Works well in class."

 (c) "Self-motivated."

 (d) "Exemplary behavior."

 (e) "Accepts responsibility."

 (f) "Cooperative and courteous."

41. In sum, Cesar's overall achievement levels and conduct at MHS placed him among the School's best students as measured by a broad range of factors and when evaluated by the totality of staff and students who encountered him.

42. When Cesar did have conduct issues, they were ordinary ones for high school children and far less serious than the problems one regularly observes in youth with severe economic or social disadvantages; e.g., Cesar had a "rough-housing" altercation or two as a freshmen and sophomore and one hallway fight as a junior. But in every case, the incidents also exposed the failure of MHS to have proper programs in place for addressing ordinary discipline problems, thus forcing children to resolve disputes on their own and in a manner that is harmful to these children.

43. While Cesar did admirably at school and in extracurricular activities, he faced only obstacles, racial derision, poor supervision, and lack of encouragement from his MHS houseparents, Robert and

Laurie Ohliger, and then from MHS leaders when Cesar's mother made the mistake of complaining about the Ohligers' abhorrent conduct.

44.     Cesar's houseparents, the Ohligers, have a history of abusive practices tolerated by MHS that ought to have led to protective measures taken in Cesar's behalf, instead of MHS allowing Cesar to be exposed to shocking and vindictive retaliatory conduct once the houseparents had a chance to pursue such retaliation.

45.     Housefather Ohliger, for instance, regularly referred to Cesar as a "wetback" and consistently made despicable, racially insensitive, and anti-Hispanic "jokes" about Cesar while Cesar resided in the Ohligers' student home.

46.     The type of racist "jokes" made by Housefather Ohliger reflects the top-down example of racism and misogyny set by, on information and belief, certain MHS leaders.  Housemother Ohliger, for her part, laughed at racial "jokes" made by students rather than discouraging such conduct or setting a proper example of respect for all ethnic groups.

47.     The Ohligers also simply ignored friction and disciplinary problems that arose among the boys at their student home, causing these problems to escalate; e.g., one boy in the student home had a grudge against Cesar and constantly harassed Cesar, leaving Cesar either to tolerate it, report it, or fight back. Cesar chose to report it, but nothing was done.  This boy then arranged to have some of his friends jump Cesar in a bathroom at the high school, with two boys serving as look-outs while two others attacked Cesar.

48.     When Cesar's mother heard of the racism and "wetback" comments directed at her boy and that the Ohilgers' failure to take reasonable measures about student home friction that had led to Cesar being ambushed in a bathroom, she complained to MHS.

49.     Mrs. Escudero insisted that the School should not condone adult, or any, racism and that remediation of disputes among children was supposed to be provided by MHS, rather than permitting problems among children to escalate until it was settled with bathroom ambushes and fists.

7

50. But these complaints by Mrs. Escudero only put Cesar in a worse position: Ohliger's "jokes" continued in a thinly-disguised form, with "Mexican" being substituted by Housefather Ohliger in each case where "wetback" had previously been used. Nor did the Ohligers change their overall policy of ignoring student home frictions. The result was that Cesar ended up being targeted for retaliation by the Ohligers once they had their chance, including Ceasar's ultimate expulsion from MHS.

51. For instance, in spite of Cesar's remarkable chess gifts, he could only participate in chess activities on the condition that the Ohligers agreed to transport him to chess club functions at the MHS junior high school, which the Ohligers refused to do. This meant that a school with $7 billion in resources was closing down all avenues for pursuing the chess career of a student who may have been the most gifted chess player ever to enroll in MHS.

### CHILDREN ABUSED AT MHS BECOME AT RISK OF SUICIDE AND OTHER DANGERS DUE TO POOR LEADERSHIP PRACTICES

52. Meanwhile, the Ohligers engaged in other shocking and abusive conduct towards children in their student home.

53. For instance, in 2006, J.C., a boy who faced emotional problems, was enrolled in MHS and placed in the Ohligers' student home.

54. J.C. required special care, counseling, and understanding because he often acted out, likely as a result of trauma in his past.

55. Reflecting the inadequate policies of the MHS leadership, the Ohligers' response to J.C.'s special needs was cruel and degrading punishment; e.g., forcing J.C. to scrub toilets with a toothbrush, crawl into large garbage cans and clean foul residue built up on the bottoms of the cans, and picking weeds for hours and hours, to an unconscionable degree.

56. The abuse of J.C. was so pronounced that even the children in the student home recognized that it was counter-productive and damaging, rather than therapeutic.

57. As the Ohligers' abuse of J.C. continued, this child eventually attempted suicide. MHS was thus on clear notice of the deficiencies of the Ohligers.

58.   Rather than dealing with the problems that J.C. faced and that the Ohligers' abuse had exacerbated, MHS expelled J.C., leaving this child in a dramatically worse state than before he had been recruited to enroll at MHS.

59.   But when the MHS President is unqualified and surrounded by similarly unqualified administrators, it is predictable that certain houseparents will address the emotional problems of such a child as J.C. by abusing the child with humiliating chores that exacerbate the problems, instead of utilizing rational and therapeutic responses to the child's needs.

60.   On information and belief, there are several other examples similar to J.C.'s throughout MHS, with other children, too, being driven to the edge of suicide and then quietly expelled solely to prevent public scandal.  All of this is kept quiet by the School even though the MHS Board of Managers (the "MHS Board") knows that the School's leadership is a direct cause of these and other problems, placing MHS children at risk.

61.   But with thousands of applicants seeking to enroll at MHS, the School can simply replace such children as J.C. instead of addressing the School's program and leadership failures.

62.   The Ohligers also punished the boys in their student home, including Cesar, by withholding food and then taunting the students about it, informing these boys, after serving them miniscule-portion dinners, that the Ohligers themselves would later order pizza delivery for themselves and their immediate family.

63.   This practice of taunting children and withholding food from hungry and growing high school boys, too, was also condoned and encouraged by the MHS leadership, and similarly reflects the general dysfunction at MHS.

64.   In an environment where MHS senior leaders, on information and belief, engage in racially insensitive conduct, are unqualified, have histories of misconduct, and otherwise allow frontline staff to abuse, ridicule, and mistreat MHS children, being at MHS is especially hard for such gifted children as Cesar who are precocious enough to point out misconduct or other inadequacies on the part of MHS leaders.

## CESAR IS TARGETED BY ONE MHS ADMINISTRATOR

65.    Cesar entered MHS filled with hopes of something better than his Reading circumstances allowed, only to be confronted with the damaging and amateurish polices and adult misconduct that have hurt so many MHS children, and that were previously unknown at MHS.

66.    On information and belief, due to the improper supervision of the improperly-hired MHS leaders, MHS leaders invariably close ranks around each other and against such students as Cesar, even when it is obvious that a childcare travesty has occurred.

67. Cesar's "crime" at MHS, and for which he eventually was expelled, centered on annoying Vice-Principal Debbie Rill when Cesar, correctly, tried to explain that he had acted as any child would under the circumstances that he faced, as described below.

68. This was compounded by the "offense" of having a mother who complained about the Ohligers' racial insensitivity and the failure of MHS to properly address frictions among children.

69.    Cesar's first encounter with Rill was when he was in 9th grade and was ambushed in a bathroom, as described above.

70.    This incident was an illustration of MHS' nonchalance about problems among MHS children, allowing these problems to escalate out of control.

71.    But rather than addressing this type of systemic failure on the part MHS, and unwilling to be bothered with sorting out the details of how Cesar was jumped, Rill simply gave all of the boys involved the same punishment.

72.    When Mrs. Escudero heard of this, she called Rill and pointed out that this was counterproductive and that it would simply lead others, including Cesar, to fail to report such incidents in the future, since there was no effort on Rill's part to assign due responsibility.  Mrs. Escudero also complained that the failure by MHS to pursue remediation or otherwise provide mechanisms for resolving disputes would lead to more such incidents in the future.

73.    Mrs. Escudero's comments only earned Cesar the animosity of Rill, who, as with other MHS administrators, is uninterested in hearing about inadequacies in MHS programs.  As described below, Rill

was acting as de facto principal for the actual principal, Skip Weber, because Weber himself was incompetent and was promoted to his position as part of the general MHS leadership dysfunction, immediately ceding responsibility to Rill.

74.     Cesar was thus in the unfortunate position of being very gifted and successful at MHS, with broad peer and teacher/coach support, but with key individuals -- Rill and the Ohligers -- bearing animus towards him, including racial animus in the Ohligers' case.

75.     In the dysfunctional and poorly-led MHS system, such individuals as Rill and the Ohligers are able to target students whom they dislike or against whom they have racial animus.

## VICE-PRINCIPAL RILL LOSES ALL CONTROL AND VINDICTIVELY LASHES OUT AT CESAR FOR HER OWN UNPROFESSIONAL LAPSE

76.     Rill's inability to handle criticism and hostility towards Cesar reached a critical point when a fight between Cesar and an older boy occurred, in May 2009.

77.     The incident began when the older boy, a senior in the culinary arts vocational program who had been cut from football that year and thus may have been envious of Cesar, who was a junior football standout and academic achiever, grabbed Cesar's girlfriend, hugged her in front of Cesar, and basically signaled to Cesar the typical high school taunt of *"So what are you going to do about it?"* Cesar began to react but then thought better, being persuaded by a friend that it was not worth it. Thus, Cesar simply walked away and went to his next class.

78.     But the other boy was intent on provoking a fight and followed Cesar into his classroom, where the boy had no reason to be, surprising the entire class. Then, in front of the class, the older boy taunted Cesar with cowardice and shouted expletives at him, challenging Cesar to fight. The teacher did absolutely nothing, failing even to call security or order the boy from the room, while Cesar was subjected to a torrent of abuse. In other words, once again in today's poorly-led MHS, the adult in charge failed to take any appropriate measures.

79.     Even after Cesar asked the teacher why she was not ordering the older boy to leave, the teacher still did nothing. Eventually, some of the other boys in the class joined in the taunting, asking Cesar why

he was not responding, until Cesar did, in fact, step outside and grudgingly accept the boy's challenge to fight. The fight ended when Cesar and the older boy were separated, with Cesar immediately ceasing to fight when told to do so while the older boy would not stop until he was tackled to the ground by the teachers who broke up the fight, as surveillance video recorded.

80.    In other words, the older boy provoked the fight, followed Cesar into his classroom to pursue the fight, insisted in front of a teacher that Cesar fight him, shouted expletives at Cesar in front of a teacher, and then had to be tackled to get him to stop fighting –and Cesar's primary fault was giving up on the MHS adult staff and taking matters into his own hands, though, even then, Cesar heeded orders to stop fighting once adults finally did take control.

81.    In what eventually became a Kafkaesque nightmare, Rill summoned Cesar to her office and confronted him over the question of whether the fight would continue, with Cesar insisting that it was over as far as he was concerned although he would defend himself if attacked; i.e., Cesar was essentially trying to explain that he had been pushed into the fight in the first place and that, in any case, he had no desire to continue the fight, but that MHS was permitting circumstances where such children as Cesar were being pushed into fights under very troubling circumstances.

82.    Cesar's spot-on criticisms hit a raw nerve with Rill, who was already predisposed to disliking Cesar for having had her decisions critiqued by Cesar's mother in the past.  Rill thus lost her temper, yelled at Cesar, called him "dense," and eventually embarrassed herself to a degree that her secretary came into the room to see why Rill was yelling hysterically.

83.    Throughout the encounter, Cesar demonstrated the discipline that a lifetime of confronting disadvantage has engrained in him, remaining calm and composed.

84.    This only incensed Rill even more, who again shouted that Cesar was "dense," which is an insult that also means "stupid."

85.    This led Cesar to question whether it was acceptable for Rill to engage in name-calling and, eventually, to ask that the meeting be continued with someone else in attendance, too, so enraged and out of control had Rill become.

86.     In other words, recognizing that Rill had become irrational, and having no means of defusing Rill's outburst, Cesar reacted by requesting that another adult in a position of responsibility be brought into the meeting as a check against Rill's intemperance.

87.     At that point, Rill's rage overcame her and she became determined to extract vengeance against Cesar to the greatest extent possible.  This was even though Cesar was, in essence, an outstanding student, well-liked, with broad teacher and coaching support, and whose misconduct was so minor that MHS' own rules prohibited Rill from any kind of draconian measures.

88.     But none of that would deter Rill from getting her vengeance against Cesar.

### RILL AND OHLIGER EXTRACT VENGEANCE AGAINST CESAR WHILE MHS "SOLVES" ANOTHER PROBLEM BY IGNORING ADULT MISCONDUCT AND EXPELLING A STUDENT FOR THE MHS LEADERSHIP'S MISTAKES

89.     Rill began pursuing her vendetta against Cesar by giving him a detention for the manner in which he responded to her outburst.

90.     Consistent with MHS rules, Cesar obtained permission to reschedule the detention, due to a preexisting and conflicting appointment that day, with the driver's education instructor.

91.     In fact, it was Rill's secretary who gave Cesar permission to reschedule the detention.

92.     Rill thereafter manipulated the circumstances to try to portray Cesar as having gone AWOL, which he was not; i.e., when Cesar temporarily could not be located by Rill, Rill set off a panicked search for him, even though Cesar was simply attending a scheduled driver's education class, as Rill's own secretary was aware.

93.     Rill compounded this lapse on her part by calling Mrs. Escudero and mistakenly informing her that Cesar was missing, panicking Mrs. Escudero into intense maternal fears, even though Rill had simply failed to make the necessary inquiries before setting off this panic.

94.     During her conversation with Rill, Mrs. Escudero struggled with her broken English to question Rill about the series of MHS actions and decisions that collectively had been working against the wellbeing of Cesar and other children, including the Ohligers' conduct and Rill's past failure to remediate disputes among MHS children.

95.    In other words, rather than accepting Rill's assertions about Cesar's purportedly being AWOL or otherwise in the wrong, Mrs. Escudero understood enough about the dysfunction at MHS to admonish Rill for what were obviously broad, programmatic problems at the School that were harming such students as Cesar.

96.    Unhappy with guardians or parents who admonish MHS leaders no matter how improperly MHS leaders and staff behave, Rill became more incensed and increasingly intent on getting back at Cesar.

97.    Thereafter, embarrassed at her own behavior, enraged at a student for maintaining his composure while she engaged in an unseemly and unprofessional meltdown, and unhappy with a guardian who correctly pointed out that the MHS leadership's policies were working hardships on MHS children, Rill seized on the fabricated AWOL scare that she herself had concocted and used this as grounds for having Cesar snatched from his student home and placed into isolation at the school's health center, without any rational grounds for doing so.

98.    Isolating Cesar in this frightening, alienating, and humiliating manner was totally unwarranted, repugnant, and antithetical to all childcare norms.

99.    Cesar was thereafter kept in isolation at the health center against his will for several days, in violation of standard childcare practices and with no grounds for such an extreme measure.

100.    Rill simultaneously called for an "Enrollment Review," which is the School's most extreme measure and is convened when MHS decides whether to expel a child deemed beyond control. Rill's decision to take this extreme measure was completely arbitrary and in direct violation of MHS' own written procedures on Enrollment Reviews, as explained in detail below.

101.    Rill then withheld from Cesar the date of the Enrollment Review, thus denying him any participation in the process while also psychologically abusing him by leaving him in limbo on the matter and in isolation at the school's health center.

102.    Rill also rejected Mrs. Escudero's requests to participate in the Enrollment Review to advocate on behalf of her son and would not even inform Mrs. Escudero when the review would occur.

103.    No one was allowed to participate in the Enrollment Review who might in any way have meaningfully advocated for Cesar or provided any kind of accurate and balanced picture of the type of student that Cesar is, which deficiency was also in violation of MHS' rules.

104.    The Enrollment Review was thus orchestrated by Rill to be a kangaroo court with the predetermined goal of expelling Cesar after an inadequate hearing that afforded Cesar no due process and that in fact violated MHS' Enrollment Review rules.

105.    The "review panel" consisted of Housefather Ohliger, Rill, an MHS psychologist, and a houseparent administrator, Ms. Mick Burton, who was closely aligned with the Ohligers and who was thus responsible for permitting all of the Ohligers' misconduct up to that point.  Cesar had no advocates on the panel or in attendance.

106.    In other words, Cesar's fate was about to be determined by a "review panel" that consisted of:

(a) A housefather who considered Cesar a "wetback" and who was long spoiling for an opportunity to retaliate against Cesar after Cesar's mother had had the "temerity" to confront the Ohligers about racism and general failure to supervise the student home properly;

(b) A vice-principal who was a de facto principal and whose rage toward Cesar was so uncontrolled that it rendered her incapable of: (i) proper neutrality about Cesar, (ii) a thoughtful decision about his best interests, or (iii) even maintaining her composure during meetings with him;

(c) An administrator whose leniency toward the Ohligers had contributed to, among other things, one boy being abused so shockingly that he eventually attempted suicide, overt racism by these houseparents, and general abuses of children in the houseparents' student home; and,

(d)    An MHS psychologist who never interviewed Cesar, never spoke with him, never set eyes on him, never tried to ascertain his side of the story, and otherwise never made even the most basic queries incumbent upon someone professionally licensed to practice psychology, let alone participate in a decision with lifelong implications for a psychologically and emotionally vulnerable child who had already suffered severe life trauma and who was at risk of facing another painful instance of rejection, loss, and abandonment in his young life.

15

107. The Enrollment Review wasthus start-to-finish a disgrace unworthy of responsible educators, child psychologists, or childcare professionals, let alone adults responsible for the wellbeing of vulnerable and at-risk youth. As such, the Enrollment Review constituted a breach of MHS' duties of care to Cesar and Mrs. Escudero.

108. Under MHS' own rules, Cesar was entitled to participation in the review process by coaches, teachers, mentors, and others who would speak on Cesar's behalf, and who would naturally have demonstrated that the total picture of Cesar was one of being a good kid who hardly deserved so draconian a punishment as expulsion.

109. However, Rill, Ohliger, and the other participants willfully kept this fact from Cesar until after the Enrollment Review was over, thus assuring themselves that no one would be able to speak for Cesar at the review and thereby securing in advance the outcome that Rill and Ohliger had sought; i.e., once again, MHS would "solve" a problem of poor leadership, adult failures, and adult misconduct by getting rid of a student who had been victimized by adults run amok within a dysfunctional MHS system.

110. Further, on information and belief, MHS has publicly represented that in the case of Enrollment Reviews, prior to expelling a child, it must be determined that all less drastic measures must have been exhausted.

111. Rill, Ohliger, and the others did not exhaust any less drastic measures in Cesar's case, skipping the school's mediation, anger management, counseling, and other intermediate steps, and instead simply jumping right to expulsion, and this, for conduct that, by any measure, was, at worst, sassing a vice-principal.

112. In fact, Burton, herself was upset at the outcome and apologized to Cesar after the fact, confessing that she thought that Cesar should not have been removed. Burton also stated that it was improper for Cesar to have been denied participation in the Enrollment Review by other staff who were knowledgeable about Cesar's many fine qualities and thus able to help present a balanced picture about Cesar.

113.    In disclosing these things to Cesar, Burton's words were to the effect of "I see you as a good kid with a lot of potential and I really don't understand why they want to expel you." But once again, in the dysfunctional and poorly-led MHS system, where adults are conditioned to act to protect their own interests instead of protecting children, Burton would not lift a finger to prevent what she recognized was a gross childcare miscarriage being perpetrated against Cesar.

114.    In sum, Cesar's Enrollment Review was completely improper, contravened MHS rules, and was below all acceptable childcare norms, with Rill and Ohliger exploiting the circumstances to expel a boy whom they both disliked, and towards whom Ohliger harbored racial animus.

115.    Cesar was thus expelled from MHS just as his junior year was ending, after three years at MHS, and though he had done nothing that could even conceivably constitute grounds for expulsion, according to MHS' own standards.

116.    In a repugnant act that shocks the conscious and illustrates the petty relish that Housefather Ohliger took in retaliating against Cesar, when boxing up Cesar's possessions for Cesar to take home, Ohliger threw away all of Cesar's MHS awards, certificates, and letters of good conduct, gratuitously kicking Cesar while he was down and thus underscoring Ohliger's blatant animus towards this boy by intentionally inflicting emotional distress on Cesar.

117.    While it was psychologically damaging enough to Cesar to be expelled after three years at MHS, and while the related dislocation already added more pain and psychological wounds to the cumulative trauma that Cesar has already faced in his young life, the gratuitous low blow of Housefather Ohliger throwing away Cesar's awards was particularly cruel and despicable to a poor family that treasures and saves these awards. Ohliger's conduct in this regard dramatically exacerbated the pain inflicted on Cesar and Mrs. Escudero and constitutes outrageous and unconscionable behavior by any reasonable standard.

118.    The other boy involved in the fight – i.e., the older boy who had provoked the fight, followed Cesar into Cesar's classroom, shouted expletives at Cesar to taunt Cesar into fighting, and then had to be tackled by two adults for refusing to stop fighting – was allowed to stay at MHS and successfully graduate, while Cesar, alone, was placed in isolation and then expelled by Rill, Ohliger, and the others.

17

## MHS IGNORES CESAR'S EFFORTS TO OBTAIN MEANINGFUL
## REVIEW OF THE UNFAIR AND IMPROPER DECISION TO EXPEL HIM

119.    While the above-described events were playing themselves out, MHS was finally acting to replace John O'Brien as MHS President.  As described below, O'Brien's hiring was itself grossly improper and contributed to the MHS dysfunction that has hurt so many children, including Cesar.

120.    But rather than replacing O'Brien with a credible and competent residential childcare leader who would begin to straighten out MHS dysfunction, the School instead replaced O'Brien with Anthony C. Colistra, an individual who, on information and belief, was himself discredited and responsible for a decade of poor MHS decisions, and who, in the past, has demonstrated complete willingness to allow MHS children be hurt no matter how egregious the circumstances.

121.    Nonetheless, trusting that Colistra might actually discharge his duties properly, Cesar and Mrs. Escudero appealed to Colistra for review of the decision to expel him.

122.    Consistent with his past conduct, Colistra resisted requests for meetings, refused to undertake any meaningful review, dissembled about what queries he did undertake, and otherwise behaved as he has in the past, cravenly siding with adults who had acted improperly and whose conduct had hurt or was hurting children.

123.    For instance, when Colistra did meet with Cesar and Mrs. Escudero, at their insistence, Colistra claimed that the coaches and teachers who Cesar had said would speak in his defense did not support Cesar.  But when Cesar pressed Colistra about this, Colistra admitted that he had never bothered to speak with these individuals, relying instead on Rill's statements about what she claims they said.

124.    Similarly, when Colistra incorrectly claimed that it was Cesar who had to be pulled away from the fistfight with the older boy, Cesar pointed out that it was the other way around, and that the surveillance video would fully support Cesar's assertions in this regard.

125.    Colistra responded to this by claiming that the surveillance video had been lost, even though Mrs. Escudero had been insisting on seeing this video from the very first moment that Rill told her of the altercation.

126.   Cesar thereupon pointed out that, even if the video had been lost, in any case, the adults involved in breaking up the fight would support Cesar's assertion on the matter, to which Colistra had no response.

127.   In essence, Colistra could not have cared less what Cesar said because Colistra would not, under any circumstances, side with an MHS child who had been hurt by the actions of MHS leaders.  This behavior is consistent with Colistra's ten-year record as a member of the MHS Board.  In fact, on information and belief, Colistra was himself directly responsible for the hiring of O'Brien and the related systemic breakdown and dysfunction that this hiring brought to MHS, while Colistra and other members of the MHS Board turned a blind eye and publicly misrepresented what the Board knew to be ongoing and severe MHS problems.

128.   Basic standards of reasonable care in handling this type of traumatic event in the life of such a child as Cesar were violated when Colistra dissembled about the actual reasons for Cesar's removal and otherwise refused to provide Cesar with the kind of rational and coherent explanation for the draconian sanction imposed on him.

## DEFENDANT MHS VIOLATED ITS OWN RULES IN EXPELLING CESAR

129.   MHS has a written policy of assigning points to students for misconduct, with 100 points triggering the so-called "Enrollment Review" to which Cesar was subjected.

130.   This policy explicitly states, "100 Points – Enrollment Review – A team representing Homelife, Scholastic, and Student Health Services meets to determine whether enrollment at Milton Hershey School will continue for that student."  Attached as Exhibit "G" to this Complaint is a copy of this MHS policy.

131.   So determined were Rill and Ohliger to "get" Cesar that this policy was ignored, as Cesar had only 90 points, even after the fistfight and the incident in Rill's office.

132.   In fact, MHS has permitted certain children to remain enrolled in spite of greatly surpassing the point limit, even where this put children at risk from the students in question.

133.   In other words, while 100 is the minimum points that a student must amass before MHS undertakes an Enrollment Review, even 100 points will not necessarily lead to expulsion.

134    For instance, after one student far surpassed 100 points, reaching 190 points, and the Enrollment Review panel decided to expel him, D. Michael Weller, the Head of the Senior Division, overruled the decision.

135.    The boy in the latter case thereafter sexually assaulted another student, and then was expelled.

136.    In other cases, students caught using narcotics have not been expelled and many other egregious cases of student misconduct have been tolerated, so long as the students do not make the mistake of exposing or questioning the inadequacies of MHS leaders.

137.    By every measure, Cesar exhibited nothing of the kind of behavioral problems that would ordinarily lead to expulsion at MHS or any other school.

138.    If not for the participation in Cesar's Enrollment Review of a housefather who emotionally abused children and an administrator whose anger skewed her judgment, and if not for the economic and social vulnerability of MHS students who generally have no means of protecting themselves against MHS leadership misconduct, Cesar today would still be held forth by MHS as the model student, athlete, gifted linguist, promising leader, and success story that he is.

139.    But no amount of pleading by Cesar, Mrs. Escudero, or anyone else could persuade MHS to undertake meaningful review of the Rill/Ohliger-orchestrated decision to expel Cesar, further compounding the breach of duty of care owed to Cesar.

140.    Cesar tried, with his mother, to write letters to the MHS leadership in order to seek credible review, but neither Cesar nor his mother were even taken seriously, with Colistra engaging in the above-mentioned dissembling about Colistra's ostensible "examination" of the matter, including the "missing" surveillance video and phantom conversations with Cesar's supporters on the MHS staff.

141.    When Cesar had letters sent to the MHS Board pleading for an inquiry into the matter and requesting assistance in preventing the related tragedy, the recipients of those letters callously ignored the pleas, not so much as acknowledging receipt. On information and belief, this is consistent with the MHS Board's conduct over time, ignoring the damage being done to MHS children no matter what is brought to its attention.

142. In sum, no matter how hard Cesar and Mrs. Escudero tried to abide by MHS policies, no matter how respectfully and rationally they tried to plead Cesar's case, and no matter how manifestly improper and violative of MHS' own rules and due process was the treatment afforded Cesar, the MHS system is so dysfunctional, its leaders so insular, and its Board of Managers so stonehearted that Cesar and Mrs. Escudero were left with no recourse other than bringing the instant action.

143. Because of the acts committed against him by MHS, Cesar is now a high school senior virtually without a school, having been forced to study independently through an Internet-based learning program, pending resolution of this proceeding.

## MHS' REPRESENTATIONS TO PROSPECTIVE STUDENTS AND THEIR PARENTS

144. Based on reasonable standards of care for at-risk children and what MHS itself represented, the travesty inflicted on Cesar and Mrs. Escudero should never have occurred.

145. Through its publications, website statements, and such events as "recruitment" fairs in Reading, defendant MHS made numerous representations to such students as Cesar and to such guardians and parents as Mrs. Escudero, convincing Mrs. Escudero and Cesar to have Cesar enroll in the School.

146. By recruiting at-risk children to enroll in MHS, and by promising these children a comprehensive and year-round residential program capable of meeting their needs and sensitive to their vulnerabilities, MHS undertakes a host of duties towards such children, including Cesar, and enters into a special relationship with them and with their guardians.

147. Among other things, defendant MHS represented that:

(a) Cesar would be raised in a nurturing and homelike environment free of racial discrimination.

(b) Cesar would be under the care of humane and professional houseparents and other staff competent to address the needs of at-risk youth and sympathetic or empathetic to the challenges faced by such youth.

(c)   Cesar would be offered the services necessary to address normal problems encountered by children in a high school setting, including certain special challenges faced by children from at-risk backgrounds.

(d)   Basic norms and procedures would be followed by MHS in addressing ordinary challenges that Cesar might face at MHS, be these behavioral, emotional, or academic.

(e)   MHS houseparents, teachers, child psychologists, and other frontline staff would be competent professionals capable of meeting the needs of at-risk youth, supervised by quality leadership, and otherwise meeting ordinary standards of care for such professionals.

(f)   MHS would honor its own written policies and guidelines in addressing problems faced by children and would be fair in all instances when applying MHS rules to the conduct of children enrolled in the School.

(g)   MHS would meet certain minimum standards of care in addressing the needs of children so as to avoid doing more harm than good as concerns these children.

(h)   Children who face problems at MHS would be afforded services for ameliorating problems in a rational and consistent manner.

148.   Each and every one of the above representations was manifestly false as to Cesar and many other children.

**MHS HIRES INCOMPETENT LEADERS WHOSE POLICIES HARM CHILDREN**

149.   On information and belief, rather than hiring competent and qualified administrators, MHS has hired and is led by individuals with checkered backgrounds, falsified credentials, records of previous termination by MHS, and lack of basic residential childcare leadership skills.

150.   MHS' leadership hiring deficiencies have caused MHS children to be hurt in astonishingly large numbers, with some children being placed in direct physical danger, some children being psychologically abused, and hundreds of children being removed in a willy-nilly manner that contravenes residential childcare norms.

151. Even when MHS and the MHS Board become aware of and are placed on notice that children have been harmed by the misconduct of adults employed by the School, MHS fails to take appropriate measures to address the damage done to these children, thereby compounding the damage done to these children and increasing the emotional pain inflicted on them.

152. In many cases where poor decisions and dangerous policies cause harm to children, MHS responds by simply sending children away, including Cesar, J.C., and many others, in an effort to hide the School's glaring inadequacies.

153. MHS replaces the children who are removed with other students recruited from among the thousands of needy children lined up every day to seek refuge at MHS.

154. In this manner, MHS conceals broad and systemic problems, cycling children in and out like fodder and expelling ones whom MHS harms, rather than fixing MHS deficiencies.

155. On information and belief, MHS takes the position that simply boosting enrollment is adequate to demonstrate that it is "successful" in wielding its vast resources properly.

156. Thus, MHS quickly replaces removed children without fixing deficiencies, keeping MHS enrollment high, but at a devastating cost to the children being harmed, removed, and replaced.

157. Once children enter MHS, it is quickly made clear to them and their guardians that minor children from at-risk backgrounds are expendable and can easily be replaced if they or their guardians will not tolerate the School's inadequacies.

158. The MHS Board has a duty of care to MHS children but has turned a blind eye to problems, refusing to replace incompetent leadership. The MHS Board's own public misrepresentations contribute to enticing more children to enroll in the School and thus helps perpetuate the cycle of using children as fodder for sustaining a broken system.

159. MHS can fail children and maintain high enrollment because its misrepresentations, spectacular facilities, and such enticements as its college scholarship program, in combination with the needs of so many children today, assure it of an infinite supply of children desperate to access the School's vast resources.

160. MHS thus perpetrates a continuous bait-and-switch scheme on waves of children and guardians, using new enrollees to replace earlier child victims and preying on the desperation of needy families to sustain an enrollment-inflating apparatus. This system callously cycles child victims in and out of the School rather than fixing MHS' problems.

161. While MHS' resources allow it to hire the nation's finest childcare leaders or at least competent ones, on information and belief, MHS instead has hired incompetent individuals, failing to screen them properly, and compounding this by improperly supervising them no matter how egregious their policies or behavior.

162. On information and belief, MHS leaders who have been negligently hired promulgate indefensible programs, tolerate or encourage abuses of MHS children, foster an environment of intense bullying of frontline care-providers, and otherwise create a climate of racism, misogyny, and abuse of MHS children. This is in a manner that causes MHS to fail students enrolled in the School and endangers and harms such children, including Cesar.

## MHS' HIRING OF INCOMPETENT LEADERS

163. For example, on information and belief, MHS hired a President in 2003, John A. O'Brien, in spite of discovering that O'Brien, for decades, had been falsely claiming to hold a graduate degree in psychology from Johns Hopkins University.

164. On information and belief, at the time that MHS hired O'Brien, it also knew of other highly questionable conduct on O'Brien's part and other factors relating to his conduct that should have disqualified him from the position.

165. On information and belief, MHS nonetheless funded a media campaign that glossed over O'Brien's inadequacies and helped O'Brien propagate his false claims, misleading parents and guardians of prospective students into believing that their children would be under the care of competent and able leadership rather than at the mercy of imposters without the requisite skills or temperament for properly running a residential childcare facility.

166.    On information and belief, competent child psychologists and other professionals at MHS are undermined in their work due to these types of serious leadership deficiencies in a way that creates the circumstances that harmed Cesar and other children.

167.    On information and belief, many of the most able professionals depart MHS rather than answer to charlatans who impose child-harming and amateurish policies.

168.    On information and belief, a steady stream of competent professionals have departed MHS at every level, from houseparents and human resources personnel to construction management experts and other mid-level administrators, every one of whom can verify the degree to which MHS leadership deficiencies are harming children.  These competent professionals include Ron Thompson, Ray Brace, David Burns, and others.

169.    On information and belief, departing and outspoken MHS employees do not expose MHS deficiencies because nearly all of them have been induced by a financial settlement to sign non-disparagement agreements that work to prohibit their disclosing MHS problems.

170.    O'Brien has participated in promulgating the policies that relate to Cesar in this matter and is otherwise a direct cause of the departure from MHS of the 1,141 children who left MHS during O'Brien's tenure, including Cesar.

171.    On information and belief, even as the number of departing children mushroomed under O'Brien's failed leadership, MHS turned a blind eye, in spite of the mounting damage suffered by these 1,141 children.  MHS also helped conceal these problems by falsely claiming a 90% retention rate when the actual rate is 28%.

172.    The child-harming policies promulgated under O'Brien fall into two broad categories: (a) those easily discernible, such as infrastructure and housing decisions; and (b) those not easily discernible, such as hiring of other incompetent individuals and creation of irrational rules.

173.    Among the easily discernable harmful policies promulgated by O'Brien was creation of a recklessly experimental twin-building/40-child intake facility that housed children in 20-child bedrooms.

25

On information and belief, this experiment hearkened back to practices discredited 100 years ago and was in direct contravention of all residential childcare norms.

174.    In this manner, whether promulgating child-harming policies, hiring individuals with inadequate qualifications, or allowing incompetent administrators to stay in their positions, MHS has willfully and knowingly placed needy children at risk and done severe damage to over a thousand needy children, including Cesar.

175.    On information and belief, O'Brien and his core leadership team bullied and abused staff who questioned poor policies in order to impose dangerous and child-harming housing schemes and other poor policies.

176.    On information and belief, MHS ignored this bullying.

177.    On information and belief, in many cases, the most caring staff, particularly houseparents who sought to protect children, were treated viciously and driven away or fired, often being paid large sums of money to procure their silence about the actual state of affairs at MHS.

178.    On information and belief, among such houseparents were Chester & Carol Ross and Kent & Linda Mummau.

179.    On information and belief, MHS ignored this pattern of conduct on the part of O'Brien and his leadership team, even though MHS knew it was demoralizing frontline staff and contributing to a downward spiral in the climate at MHS in a way that ultimately harms children.

180.    On information and belief, MHS ultimately determined, no later than spring 2008, that O'Brien's poor performance, bullying, improper hiring practices, extraordinary absenteeism, and reckless experimental residential schemes were harmful to children and that O'Brien had to leave.

181.    In fact, on information and belief, during Cesar's entire junior year, when MHS was breaching its duties to Cesar and Cesar was facing grossly negligent MHS leadership decisions, O'Brien was allowed to remain in his position even though MHS had already concluded that O'Brien was unfit in that role and that his presence at MHS was placing children at risk.

182.    On information and belief, O'Brien also appears to have been behind a purportedly anonymous April 2009 pair of letters that attacked MHS for the manner in which it was choosing O'Brien's eventual successor, Anthony C. Colistra.

183.    On information and belief, Colistra is another discredited individual with his own checkered background, as O'Brien apparently highlights in his letters. Exhibit "H" to this Complaint are copies of the letters that appear to have been sent by O'Brien, copies of which were also provided to MHS to alert MHS of this behavior.

184.    On information and belief, the letters show that the MHS President at the time, O'Brien, fully understood that MHS was conducting a sham search for a new President; i.e., while MHS has publicly represented that it was undertaking a nationwide search to replace O'Brien with a quality residential childcare leader, this, too, was a complete falsehood, MHS was conducting a sham search, and the predetermined selection of Colistra was known in advance to MHS decision-makers, many of whom owed their lucrative MHS Board positions to Colistra. This improper hiring decision by MHS has harmed Cesar and will harm more children, too, by saddling MHS with another incompetent President.

185.    O'Brien and Colistra played direct roles in the decisions that harmed Cesar, having already had direct roles in creating the MHS climate that has harmed over a thousand children similar to Cesar.

186.    On information and belief, Colistra, as the prior chairman of the MHS Board who served on the Board during this and the previous MHS President's terms, is responsible for endorsing virtually every harmful policy promulgated at MHS over the last ten years.

187.    On information and belief, this includes hiring O'Brien, permitting O'Brien's improper decisions, and approving such failed experiments as 20-child bedrooms under O'Brien and "multi-age housing" under the previous MHS President. "Multi-age housing" was the practice of placing the youngest and most vulnerable children in the same sleeping quarters as the oldest and most aggressive children, also in reckless disregard of residential childcare norms.

188.    On information and belief, replacing O'Brien with Colistra was undertaken solely to help MHS conceal gross failures and dysfunction under O'Brien, because MHS knew a credible, outside leader

27

would expose failures by, among other things, immediately shutting down such reckless and child-harming experiments as the 40-child intake facility or otherwise making public what an abysmal leadership spiral has been transpiring while the MHS Board turned a blind eye.

189.    Competent and timely action by the MHS Board to have replaced O'Brien with a qualified leader and put an end to poor MHS policies would have improved Cesar's circumstances and prevented the tragedy that eventually unfolded first under O'Brien and then, later, under Colistra.

### O'BRIEN SURROUNDS HIMSELF WITH INCOMPETENT CRONIES

190.    On information and belief, with MHS' full approval, O'Brien surrounded himself with fellow administrators who were equally incompetent yes-men lacking appropriate qualifications, and who joined O'Brien in imposing failed policies on MHS over all knowledgeable objections.  O'Brien's key cronies then recruited or promoted other incompetent individuals, thus saddling MHS with layers of administrators who hurt children, including Cesar, and who are totally incapable of running a childcare facility, having been chosen simply to create a power base for O'Brien and his lackeys.

191.    On information and belief, O'Brien's cronies helped him bully employees who resisted harmful decisions and aided O'Brien in smearing caring critics. This has fostered an environment where adult staff, beaten down by the leadership, remain silent about harms to such children as Cesar, rather than acting to protect such children.

192.    O'Brien's crony administrators were unfit to run MHS and their hiring was a component of the breach of MHS' duty of care to such children as Cesar and such guardians as Mrs. Escudero.

193.    On information and belief, O'Brien's crony administrators include Peter Gurt, Ralph Carfagno, D. Michael Weller, and others hired or promoted by them, several of whom played direct roles in causing harm to Cesar.

### O'BRIEN CRONY PETER GURT

194.    On information and belief, O'Brien's primary crony hire was of Vice-President Peter Gurt, who played a direct role in the harms done to Cesar.  Gurt's role has included helping O'Brien bully employees in order to squash staff opposition to child-harming policies.

195.    On information and belief, Gurt was earlier forced to resign from MHS due to inappropriate personal conduct and MHS was otherwise aware that his behavior was otherw below accepted standards for an at-risk childcare facility.

196.    As an example, on information and belief, after an MHS girl had been subjected to shocking behavior that contributed to her becoming suicidal, Gurt made lewd and lascivious comments ridiculing the girl and endorsing what had been done to her.

197.    On information and belief, this kind of repugnant "joke" was no surprise to an MHS leadership that is aware of Gurt's penchant for vulgar and racial "humor," including in front of MHS children, staff, and others.

198.    On information and belief, Gurt's "joke" about the incident shocked the girl's friends, leading them to complain to their houseparents about the incident.

199.    Attached as Exhibit "I" to this Complaint is a letter compiled by MHS staff and sent to the MHS Board, alerting MHS to Gurt's misconduct.

200.    On information and belief, the letter was sent anonymously because MHS employees have been so bullied by the MHS leadership, including Gurt and O'Brien, that most employees are afraid to utter a word of open criticism, even if necessary to protect a child from harm, such as Cesar or the suicidal girl mentioned here.

201.    On information and belief, in spite of being apprised of this misconduct by Gurt, MHS took no meaningful action against him.

202.    On information and belief, Gurt has permitted and fostered a climate of racial insensitiviy and misogyny at MHS.

203.    On information and belief, in one such instance tolerated by Gurt, the son of MHS housparent Brett Harwood was beaten unconscious by the son of MHS houseparent administrator Tim Wasleiwski. This beating occurred after Harwood, the houseparent, had lodged a civil rights complaint against Wasleiwski, the administrator.  Wasleiwski had allegedly repeatedly told Harwood, who is of mixed-race

decent, that children of mixed-race couples were "genetically inferior." Wasleiwski is in charge of high school houseparents and thus directly responsible for supervising Cesar's houseparents.

204.    On information and belief, MHS had to pay Harwood a large sum of money to settle civil rights claims brought by Harwood on account of Wasleiwski's allegedly racist behavior.

205.    On information and belief, another incompetent crony promoted by Gurt was Skip Weber. Weber was named high school principal in spite of a lack of fitness for the position and his unfitness contributed to poor policies, including ones that harmed Cesar. Weber's incompetence also resulted in delegation of major responsibility to Vice-Principal Debbie Rill, who became the de facto principal, in spite of her own unfitness to hold the position.

206.    In this manner, an incompetent MHS President, O'Brien, hired an unfit Vice-President, Gurt, who surrounded himself with such fellow incompetents as Weber, Rill, Wasleiwski, and others, all of which led to MHS policies that are a shambles and that harm such children as Cesar.

207.    On information and belief, among the reckless schemes hatched by Gurt, Weber, Rill, and Wasleiwski, and that damaged MHS children and put hundreds of them at risk, including at risk of sexual assault, was an all-night trip to a Philadelphia game arcade for virtually every MHS high school student.

208.    During this trip, on information and belief, students were mixed by grade and gender on buses that left MHS at 8 PM and returned at 4 AM, even though the buses were not properly chaperoned and several tragic incidents of a sexual nature occurred during the return trip.

209.    On information and belief, the incidents that occurred during the trip were completely predictable given that, e.g., 12th grade boys were placed on unchaperoned or under-chaperoned buses together with 9th grade girls, and given that houseparents had already alerted MHS leaders of the need for greater vigilance on buses even during normal (daylight) hours.

210.    On information and belief, MHS turned a blind eye to the conduct of Gurt, O'Brien, Weber, Rill, Wasleiwski, and other MHS administrators in organizing this reckless event, while children who engaged in misconduct during the bus ride were severely punished, in some cases with devastating and lifelong consequences.

211.    On information and belief, when such MHS leaders as Gurt make inappropriate "jokes" about drug use, as he has been known to do, ridicule the sexual abuse of girls, or engage in racial stereotyping, the behavior percolates down to frontline staff and fosters a climate where such children as Cesar and others suffer, including from racist behavior by such adult staff as Cesar's houseparents.

212.    On information and belief, Gurt is among the senior leaders most involved in fostering a false public image of caring and knowledgeable MHS leaders, and for this reason, too, is not removed from his position in spite of a history of glaring misconduct and creation of a coterie of unfit mid-level administrators.

213.    On information and belief, one of the incompetent crony administrators recruited by O'Brien and Gurt to help impose poor policies was Ralph Carfagno.  Carfagno was initially hired under O'Brien and Gurt to run a program that included providing college guidance to MHS children, even though Carfagno had never attended college, or even junior college, and possessed virtually no qualifications for the position for which he was hired.

214.    By placing incompetent individuals in key positions, not only has MHS fostered amateurish programs that these individuals endorse, but it has also demoralized competent staff and driven away many of the most able MHS professionals.  This has a systemic effect on MHS that percolates down to children, including Cesar, who then suffer top-down inadequacies fostered by MHS' negligent leadership-selection scheme.

### O'BRIEN CRONY D. MICHAEL WELLER

215.    On information and belief, another of the incompetent crony administrators recruited by O'Brien and Gurt to help them impose poor policies was D. Michael Weller, who also has a background known to MHS that ought to have disqualified him from any MHS role.  Weller is currently Head of the Senior Division and thus has been directly responsible for what was done to Cesar.

216.    On information and belief, Weller: (a) was fired by MHS in the past before being rehired by O'Brien; and (b) is known for incidents involving drunken driving and other inappropriate drunken

conduct directed towards young female MHS graduates and, on one occasion, a female MHS student whom Weller was tasked with driving to Philadelphia for presentation of an award.

217. On information and belief, Gurt, Carfagno, and Weller also helped orchestrate smear campaigns against critics of MHS policies, in an effort to quash all caring voices of dissent and silence those who argue for better childcare policies or competent leadership hiring.

218. In sum, on information and belief, under O'Brien and the MHS Board, individuals have been hired to lead MHS in a manner that has brought about a "frat house" environment and such reckless housing schemes as 20-child bedrooms, all of which has contributed to broad and systemic breakdown at MHS. The combination of senior leadership misconduct and inept policies is evidenced by the fact that 1,141 children have departed MHS under the School's grossly failed leadership.

140. On information and belief, MHS knew of the inadequacies on the part of these senior leaders but willfully ignored it. Whether it is an MHS Vice-President's repugnant ridiculing of a sexually abused girl, the former MHS President's credential falsification and rank bullying of staff, or Colistra's decade of child-harming decisions, the MHS Board has consistently closed ranks behind MHS administrators and allowed over a thousand needy children to pay the price, rather than risk tarnishing the public image that the MHS Board has cultivated.

## COUNT I - NEGLIGENCE - IN TORT

219. The averments of paragraphs 1 through 218 are incorporated herein by reference as though the same were fully set forth herein at length.

220. Defendant, by its actions, including, inter alia, its solicitation of Cesar to enroll in MHS, its representations about MHS' capacity to provide a proper and nurturing environment for Cesar, and its undertaking of care for Cesar in a residential setting with a year-round program that was purportedly suitable for such children as Cesar, was under a duty of care to Cesar and Mrs. Escudero.

221. Defendant had a special relationship with Cesar and Mrs. Escudero giving rise to a duty of care to them, including awareness of the vulnerability of such minor children as Cesar to the jarring dislocation

of removal from MHS once enrolled, and including awareness of the harm to such parents as Mrs. Escudero in the event that such children as Cesar were harmed by MHS policies.

222.    Defendant, by its actions, including, inter alia, hiring MHS administrators who are unfit to run a residential childcare facility, failing to properly supervise MHS administrators who are known to be unfit, violating its own rules about Enrollment Reviews in Cesar's case, permitting racist and misogynist conduct by MHS leaders and frontline staff, willfully tilting Cesar's Enrollment Review to disfavor Cesar, having a child psychologist participate in Cesar's Enrollment Review without so much as ever setting eye on or speaking to him, allowing an individual, Ohliger, with racial animus toward Cesar to participate in Cesar's Enrollment Review, allowing an individual, Rill, with overt hostility towards Cesar to participate in Cesar's Enrollment Review, denying Cesar's right to have supporters participate in his Enrollment Review, failing to meet normal standards of conduct in regard to handling ordinary behavioral problems by minor children in its care, failing to have in place any credible check against MHS leaders acting improperly, failing to inform Cesar and Mrs. Escudero that Cesar could have supportive witnesses participate in his Enrollment Review, improperly consigning Cesar to isolation in the School's health center, refusing to inform Cesar or Mrs. Escudero when the Enrollment Review would be conducted, throwing away Cesar's MHS awards in an act of gratuitous cruelty, falsely stating that the decision to expel Cesar was meaningfully reexamined by Colistra, dissembling about the decision to expel Cesar, allowing a video to be lost when that video would support Cesar's position, and subjecting Cesar to a racist and abusive environment in his student home, breached its duty of care to Cesar and Mrs. Escudero.

223.    Cesar has suffered and is suffering severe emotional, financial, and personal damage as a result of defendant MHS' breach of its duties of care, including ruptured relations with MHS friends and peers, life dislocation due to removal from his high school, trauma from the manifestly unfair and racist way that he was treated, depression, embarrassment, humiliation, loss of his entire senior year football season after preparing for this once-in-a-lifetime moment in a high school football player's life from the age of five until the age of seventeen, academic dislocation from having to change schools, consignment to study in and ultimately receive a degree from an Internet-based school, and other non-monetary and monetary

damage, all of which is more pronounced in such cases as Cesar's due to the special vulnerability of such minor children as Cesar because they enter MHS after having already suffered substantial life trauma.

224.    Mrs. Escudero has suffered and is suffering severe emotional, financial, and personal damage as a result of defendant MHS' breach of it duties of care to Cesar and Mrs. Escudero in that the suffering of Cesar is felt equally by his mother, who, additionally, also suffers terrible guilt at having ever permitted Cesar to be subjected to the misconduct of key personnel of defendant MHS.

225.    There is a direct causal link between MHS' breach of its duty of care to Cesar and Mrs. Escudero and the damages being suffered by them is caused directly by MHS' negligent breach of its duty of care to them.

## COUNT II - FRAUDULENT MISREPRESENTATION - IN TORT

226.    The averments of paragraphs 1 through 218 are incorporated herein by reference as though the same were fully set forth herein at length.

227.    Defendant MHS represented that:

(a)    Cesar would be raised in a nurturing and homelike environment free of racial discrimination.

(b)    Cesar would be under the care of humane and professional houseparents and other staff competent to address the needs of at-risk youth and sympathetic or empathetic to the challenges faced by such youth.

(c)    Cesar would be offered the services necessary to address normal problems encountered by children in a high school setting, including certain special challenges faced by children from at-risk backgrounds.

(d)    Basic norms and procedures would be followed by MHS in addressing ordinary challenges that Cesar might face at MHS, be these behavioral, emotional, or academic.

(e)    MHS houseparents, teachers, child psychologists, and other frontline staff would be competent professionals capable of meeting the needs of at-risk youth, supervised by quality leadership, and otherwise meeting ordinary standards of care for such professionals.

34

(f)      MHS would honor its own written policies and guidelines in addressing problems faced by children and would be fair in all instances when applying MHS rules to the conduct of children enrolled in the School.

(g)      MHS would meet certain minimum standards of care in addressing the needs of children so as to avoid doing more harm than good as concerns these children.

(h)      Children who face problems at MHS would be afforded services for ameliorating problems in a rational and consistent manner.

228.   Each and every one of these representations was false.

229.   In deciding that Cesar would enroll in MHS, Cesar and Mrs. Escudero relied on these representations.

230.   Defendant MHS, in soliciting Cesar's enrollment in MHS, made the following material omissions concerning the School and what Cesar and other children would face at MHS:

(a)      That Cesar's housefather would act in a racially insensitive and abusive manner and retaliate against Cesar if he or his mother complained about this.

(b)      That MHS senior leaders would have records of racism, misogyny, credential falsification, support of such knowingly child-harming policies as 20-child bedrooms, and prior firing by MHS.

(c)      That MHS would violate its own, written rules when seeking to terminate a child.

(d)      That MHS senior leaders engaged in inappropriate conduct towards MHS children and young graduates.

(e)      That MHS children would be placed in knowingly dangerous circumstances.

231.   Had Cesar and Mrs. Escudero been aware of the omissions noted in the previous paragraph, Cesar would not have been enrolled in MHS.

232.   As a result of defendant MHS' misrepresentations and omissions, Cesar was enrolled in MHS when, had the truth been known to Cesar and Mrs. Escudero, Cesar would not have been so enrolled.

233. Cesar and Mrs. Escudero were harmed as a result of Cesar's enrollment in MHS and the cumulative abuses that Cesar suffered there, including, in particular, the unfair and traumatizing way that Cesar was expelled compounded by Ohliger's gratuitous discarding of Cesar's MHS awards and, later, Colistra's dissembling about Cesar's removal.

234. Defendant MHS' misrepresentations and omissions are a direct cause of the harm suffered by Cesar and Mrs. Escudero because, but for these misrepresentations and omissions, Cesar would never have been enrolled in MHS.

235. Cesar has suffered and is suffering severe emotional, financial, and personal damage as a result of defendant MHS' breach of its duties of care, including ruptured relations with MHS friends and peers, life dislocation due to removal from his high school, trauma from the manifestly unfair and racist way that he was treated, depression, embarrassment, humiliation, loss of his entire senior year football season after preparing for this once-in-a-lifetime moment in a high school football player's life from the age of five until the age of seventeen, academic dislocation from having to change schools, consignment to study in and ultimately receive a degree from an Internet-based school, and other non-monetary and monetary damage, all of which is more pronounced in such cases as Cesar's due to the special vulnerability of such students as Cesar because they enter MHS after having already suffered substantial life trauma.

236. Mrs. Escudero has suffered and is suffering severe emotional, financial, and personal damage as a result of defendant MHS' breach of it duties of care to Cesar and Mrs. Escudero in that the suffering of Cesar is felt equally by his mother, who, additionally, also suffers terrible guilt at having ever permitted Cesar to be subjected to the misconduct of defendant MHS.

### COUNT III – BREACH OF FIDUCIARY DUTY - IN TORT

237. The averments of paragraphs 1 through 218 are incorporated herein by reference as though the same were fully set forth herein at length.

238. MHS' hiring of O'Brien, Gurt, Weller, and Colistra in spite of their histories of misconduct, credential falsification, drug use, public misrepresentations, personality disorders, and support for such

blatantly child-harming policies as 20-child bedrooms and multi-age housing was below any reasonable standard for hiring by MHS qua residential childcare facility.

239.    The improper hiring of such persons as O'Brien, Gurt, Weller, and Colistra led to the improper hiring and improper supervision of such persons as the Ohligers, Rill, the unknown psychologist who participated in Cesar's Enrollment Review without bothering to speak so much as one word with Cesar, and other MHS leadership constitutes a breach of MHS' duty to Cesar and Mrs. Escudero and is in fact negligent by ordinary standards of care concerning MHS qua residential childcare facility.

240.    MHS' negligent hiring of such persons as O'Brien, Gurt, Weller, and Colistra has led directly to the environment of dysfunction and improper decisions that have brought cumulative harm to Cesar and Mrs. Escudero.

241.    Cesar has suffered and is suffering severe emotional, financial, and personal damage as a result of defendant MHS' breach of its duties of care, including ruptured relations with MHS friends and peers, life dislocation due to removal from his high school, trauma from the manifestly unfair and racist way that he was treated, depression, embarrassment, humiliation, loss of his entire senior year football season after preparing for this once-in-a-lifetime moment in a high school football player's life from the age of five until the age of seventeen, academic dislocation from having to change schools, consignment to study in and ultimately receive a degree from an Internet-based school, and other non-monetary and monetary damage, all of which is more pronounced in such cases as Cesar's due to the special vulnerability of such students as Cesar because they enter MHS after having already suffered substantial life trauma.

242.    Mrs. Escudero has suffered and is suffering severe emotional, financial, and personal damage as a result of defendant MHS' breach of it duties of care to Cesar and Mrs. Escudero in that the suffering of Cesar is felt equally by his mother, who, additionally, also suffers terrible guilt at having ever permitted Cesar to be subjected to the misconduct of defendant MHS.

## COUNT IV – UNLAWFUL IMPRISONMENT – IN TORT

243.    The averments of paragraphs 1 through 218 are incorporated herein by reference as though the same were fully set forth herein at length.

37

244.    The placement of Cesar in isolation in the School's health center was improper, against Cesar's will, a violation of MHS' own rules, and unwarranted by any of the circumstances at the time in question.

245.    This involuntary placement of Cesar in isolation at the School's health center constituted false imprisonment.

246.    Cesar has suffered and is suffering severe emotional damage as a result of his false imprisonment by defendant MHS.

247.    Mrs. Escudero has suffered and is suffering severe emotional damage as a result of Cesar's false imprisonment by defendant MHS, including terrible guilt at having permitted Cesar to be subjected to the misconduct of defendant MHS.

**COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL HARM – IN TORT**

[Will complete later.]

Count V – Discrimination [will complete later]

Count VI – Due Process Hearing [will complete Later]

WHEREFORE, plaintiffs Cesar and Mrs. Escudero respectfully request that judgment in their

Count VII – Violation of Disabities Act [To complete later too late.

favor and against the defendant be entered, including a plot that Cesar be immediately reinstated at

Count VIII – Violation of the Right to Right Education [to

MHS together with damages in an amount in excess of $_____, plus interest, attorney fees, and costs of

Count IX – Not Gifted Education provided) Complete later]

suit, together with any such other and further relief deemed appropriate by this Court.

Count X – Civil Rights Violation [To [to complete later] complete later]

Respectfully submitted,

3 million Dollars (scholarship and Damages to Mother and Son)

and 4 Billion Dollars to any Foundation the Judge

Dated: November __, 2009.

consider appropiate for the Benefit of Some and Future Milton Hershey Students providing them the right Education with right people.

38